**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| MARSHALL G. WELTON,            ) | |
|                      ) | |
|              Plaintiff,            ) | |
|                      ) | |
|              v.                 ) | Case No. 1:13-cv-01398-TWP-DML |
|                      ) | |
| OFFICER SHANI J. ANDERSON,    ) | |
| individually.                    ) | |
|                      ) | |
|             Defendant.          ) | |
|                      ) | |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Shani J. Anderson ("Det. Anderson") (Filing No. 98). Following a dispute between Michael L. Thompson ("Thompson") and Plaintiff Marshall G. Welton ("Welton") regarding the conveyance of property located in Indianapolis, Indiana, Thompson lodged a criminal complaint against Welton, which led to an investigation and filing of criminal charges against Welton. After dismissal of his criminal case in state court, Welton filed this malicious prosecution case against Thompson[1] and Det. Anderson. Det. Anderson filed a motion for summary judgment, asserting that the evidence negates elements of Welton's malicious prosecution claims thereby entitling her to judgment. For the following reasons, the Court **GRANTS** Det. Anderson's Motion for Summary Judgment.

## I.    BACKGROUND

The following material facts are not necessarily objectively true; but, as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Welton as the

---

[1] Thompson was originally named as a defendant in this action, however, on August 12, 2016 the Court granted the parties' joint motion to dismiss with prejudice, all claims against Thompson. (*See* Filing No. 119.)

non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Welton is an Indianapolis businessman who has a bachelor's degree in business, an MBA, and a J.D.  He was a manager for Wong Ventures V, LLC ("Wong Ventures") and WGO Investments, Inc. ("WGO"), which were businesses engaged in buying, selling, and renting residential real estate. As a manager for Wong Ventures and WGO, Welton had authority to conduct the business of the two companies and sign documents on their behalf.  However, Welton was not an owner of either Wong Ventures or WGO (Filing No. 107-31 at 1).

Thompson purchased a house located at 3508 Ireland Drive in Indianapolis (the "house") in 1978, and after living there with his wife for two years, he began renting it to other people in 1980 (Filing No. 100-2 at 5).  He continued renting out the house until his last tenant died in 2008. *Id.* at 6.  The following year, a fire destroyed much of the house on June 9, 2009.  *Id.* at 11.

In August 2009, Thompson received an advertising postcard from one of Welton's companies that helps reduce property taxes (Filing No. 100-2 at 22).  Thompson called and spoke to Welton on September 24, 2009.  Welton emailed Thompson the following day.  *Id.*  Thompson contends that about three or four days after they talked, he and Welton met at the house. *Id.* at 23. Welton informed Thompson that he would like to buy the house, and Thompson told Welton that he would like to sell the house after he settled his fire claim with his insurance company.  *Id.* at 25–26.  Welton says this conversation about selling and buying the house occurred during the September 24, 2009 telephone call and that the two men did not meet at the house until November 2009.  (Filing No. 108-1 at 2 ¶4.)

In November 2009, Thompson received a check for the actual cash value of the house from the insurance company in the amount of approximately $66,000.00 (Filing No. 100-2 at 4, 16).

An additional approximately $15,000.00 was available in replacement cost insurance coverage if the house was repaired.  *Id.* at 16.  Thompson alleges that he called Welton again to ask if Welton was still interested in purchasing the house (Filing No. 100-3 at 7).  During the telephone call, Welton informed Thompson that he had completed significant work on the house—removing drywall, rewiring the electrical system, and other work. *Id.* Thompson previously had provided the lock combination to the house to Welton (Filing No. 108-2 at 52). After this telephone call, Thompson went to the house near the end of November and discovered that he could not get into the house because the locks had been changed.  *Id.*

Welton provides a different version of the events.  In mid-November 2009, Welton was contacted by Thompson to discuss selling and buying the house.  Thompson told Welton that the insurance proceeds had been paid and they could now discuss him purchasing the house.  Soon after the telephone call, Welton and Thompson met at the house and agreed that Wong Ventures would repair the residence.  Thompson would then try to recover the additional replacement cost insurance coverage.  If he was successful, Thompson would pay Wong Ventures $5,000.00 and convey the house to Wong Ventures.  Alternatively, if Thompson's insurer did not pay additional insurance proceeds, Wong Ventures would pay $5,000.00 to Thompson, and Thompson would then convey the house to Wong Ventures. Thompson and Wong Ventures would share the cost of cleaning up the debris in the house, which Wong Ventures would cap at $2,400.00.  Welton started repairing the house in early December 2009.  When renovation started in December, Wong Ventures' contractors replaced the doors and locks to the house and placed a combination lockbox on the front door.  Welton provided the lockbox combination to Thompson so that he could review the work as it was being completed (Filing No. 108-1 at 2–4). Whether Thompson learned of the

repair work in November or December, the parties do not dispute that he consented to Welton's work on the house (Filing No. 108-2 at 51).

Welton placed a "Rent to Buy" sign at the house when the repairs were under way, and the sign listed Wong Ventures' telephone number.  The repairs were almost complete in the early spring of 2010.  At that time, Welton asked Thompson to close on their agreement to convey the house to Wong Ventures.  However, Thompson refused to convey the house and asked instead that Wong Ventures provide an invoice in excess of $85,000.00 (even though Wong Ventures' repair work was approximately $44,000.00) to assist in obtaining additional insurance money, which Welton refused to do (Filing No. 108-1 at 4).

Thompson explains that, a number of months after his November telephone call with Welton and after learning that Welton had changed the locks to the house thereby prohibiting him access, Thompson received a notice from the water company that someone had moved into the house (Filing No. 100-3 at 8).  Thompson contacted the Indianapolis Metropolitan Police Department and then went to the house.  *Id.* at 11.  He discovered that Alfred and Jackie White ("the Whites") were living in the house and that Welton had entered into a contract with the Whites to sell the house to them.  *Id.* at 11, 16.  This surprised and impressed Thompson since he had not conveyed the house to Wong Ventures or Welton.

Welton explains that the Whites entered into a "Lease with Option to Purchase" with WGO, a company that manages some of Wong Ventures' properties, on March 28, 2010.  Then on March 31, 2010, the Whites entered into a "Land Contract" with Wong Ventures to purchase the house, contingent on Wong Ventures securing the deed to the house and the Whites securing a first-time homeowner tax credit from the IRS.  However, these contingencies were noted in the "Lease with Option to Purchase," not in the "Land Contract," Filing No. 108-1 at 6.  The "Land Contract"

represented that "[Wong Ventures] has good and merchantable title to the Real Estate, free and clear of any and all liens, leases, restrictions and encumbrances."  (Filing No. 107-8 at 3 ¶4.) Welton asserts that he informed Thompson that he had rented the house to the Whites during their periodic telephone calls (Filing No. 108-1 at 6).  In May 2010, an attorney for the Whites notified Wong Ventures that Mr. White was mentally incapacitated and incompetent to execute contracts, thereby voiding the "Lease with Option to Purchase" and the "Land Contract."  Welton, Wong Ventures and WGO agreed and cancelled the contracts and sent a cashier's check to the Whites' attorney.  *Id.* at 6–7. Welton explains that the contingencies of the "Land Contract" were never met, and thus, it was as though the contract never existed.

Welton made several requests to Thompson to convey the house to Wong Ventures, but Thompson failed to cooperate.  Welton obtained a cashier's check on two different occasions in May and June 2010, provided the cashier's check to Wong Ventures' attorney, and asked Thompson to pick up the cashier's check and deliver the deed for the house, but Thompson refused to convey the house (Filing No. 108-1 at 5).

On the other hand, Thompson contends that he tried on many occasions to communicate with Welton but did not get any response (Filing No. 108-2 at 65).  In talking with the Whites, Thompson learned that many of the repairs were completed below standard, so Thompson called the Permitting Services office for the City of Indianapolis and discovered that no permits had been pulled to do any repair work at the house.  *Id.* at 66. Thompson maintains that he called Welton and tried to get him to "settle on the house."  (Filing No. 100-3 at 9.)  Since Welton had moved someone into the house, Thompson insisted that Welton needed to agree to a price and purchase the house.  Welton responded that he expected Thompson to sign over the deed to him but that he would not pay anything for the conveyance.  *Id.*  Thompson and Welton exchanged emails on May

26, 27, 28, and June 2, 2010, regarding permits for the repair work, conveyance of the house, deeds, and the purchase price (Filing No. 107-26 at 1–3).

After the parties' impasse and shortly before June 6, 2010, Thompson lodged a criminal complaint against Welton with the Marion County Prosecutor's Office.  Also on June 6, 2010, Thompson forwarded all of his emails with Welton to Deputy Prosecutor Mary Hutchison (Filing No. 108-2 at 33–34).  The complaint against Welton was referred to Sgt. Judy Phillips, and on June 7, 2010, Sgt. Phillips took a recorded statement from Thompson via a telephone interview (Filing No. 108-23 at 19).  During the telephone interview, Thompson reported the series of events as they are described above from Thompson's vantage—Thompson and Welton talked, Welton began working on repairs without any agreement, they talked again, Welton moved the Whites into the house and purported to sell the house to them, Thompson discovered the Whites, and Thompson unsuccessfully tried to sell the house to Welton.

On June 8, 2010, Sgt. Phillips interviewed Jackie White at the house and recorded the interview (Filing No. 108-23 at 17).  Mrs. White described signing papers at the end of March 2010 and moving into the house mid-April.  By the time of the June 8, 2010 interview, the Whites' already were moving out of the house.  Mrs. White explained that the house was not safe because of poor repair work (Filing No. 107-27 at 4).  She described paying money upfront to get into the house, and nobody came back to repair the house after the money was paid.  She explained to Sgt. Phillips that she learned from her sister and neighbors that Wong Ventures was doing "fraudulent" things, so she started investigating for herself.  *Id.* at 3.  Mrs. White told Sgt. Phillips that she learned later that Thompson owned the house, but she was initially told that Welton "owned" the house through his work with Wong Ventures.  *Id.* at 4–5.

Mrs. White explained to Sgt. Phillips that she met Welton at a Hardee's restaurant where the papers were signed, and she "gave him five at the restaurant, and then we gave him a check for 875 that was supposed to go to another place, but nobody gave our deposit back. . . . They took that, put some more money down, so it was about two thousand, twenty-five hundred down." (Filing No. 107-27 at 5–6.)  She described paying another $500.00 in rent and incurring expenses for further repairs on the house.  When Sgt. Phillips reviewed the "Land Contract" with Mrs. White, Mrs. White explained that she had a power of attorney for her husband because of his mental incapacitation, and yet Mr. White had been directed "to go ahead and sign it and be done with it."  *Id.* at 7.  Mrs. White discussed the lease agreement and noted that it was not in the paperwork because Welton kept it.  *Id.*  She also discussed the paperwork that she completed with Welton for the first-time homeowner tax credit and explained that it too was fraudulent, which she discovered after talking with tax professionals.  *Id.* at 7–8.  Mrs. White told Sgt. Phillips that Welton and his "attorney buddies" asked Mr. White to sign paperwork for the tax credit, and she told them, "'No,' because I was the Power of Attorney, everything was going on too quick.  They told me to sign it, or the deal was done.  So they kind of forced him real quick to go ahead and sign it."  (Filing No. 107-27 at 8.)

The day after completing the interview with Mrs. White, Sgt. Phillips picked up documents related to the matter from the Marion County Recorder's Office, Auditor's Office, and Assessor's Officer on June 9, 2010.  She noted that there were no recorded land contracts for the house.  After interviewing Thompson and Mrs. White and collecting some documents, Sgt. Phillips assigned the case to Det. Shani Anderson, the defendant in this case, on June 9, 2010 (Filing No. 108-23 at 23).

Det. Anderson was employed by the Indianapolis Metropolitan Police Department, assigned as an investigator for the Grand Jury Division of the Marion County Prosecutor's Office

to investigate financial crimes and schemes of deception. (Filing No. 100-7 at 2). For her investigation in this matter, Det. Anderson gathered and reviewed statements and documents, talked with people on the telephone, and met with prosecutors from the Grand Jury Division who guided the investigation (Filing No. 100-1 at 12–13). Det. Anderson met frequently with the prosecutor's office to seek input and direction. On June 17, 2010, Det. Anderson spoke with Thompson, who asserted that he owned the house (Filing No. 100-7 at 2). Thompson told Det. Anderson about his interactions with Welton and explained that Welton tried to sell the house without first purchasing the house from him. He explained to Det. Anderson the same series of events that he described to Sgt. Phillips as they are described above. Thompson also explained to Det. Anderson his interactions with the Whites.

Det. Anderson met with Grover Davis ("Davis"), an attorney for Wong Ventures, on June 24, 2010. He explained to Det. Anderson that Welton was a property manager for Wong Ventures, and he did not represent Welton. His comments to Det. Anderson corroborated some of the statements that Mrs. White had made to Sgt. Phillips earlier in the investigation. Davis explained that Thompson owned the house, that Wong Ventures had not purchased the house, that Wong Ventures intended to purchase the house, and that the intended purchase was never finalized. He told Det. Anderson that he learned after the land contract was executed that Welton had sold the house without owning it and that he advised Welton that he should not have executed a land contract on the house without owning it (Filing No. 100-7 at 4).

On July 1, 2010, Det. Anderson met with the Whites. Mrs. White did most of the talking because of Mr. White's mental incapacitation. Mrs. White explained to Det. Anderson about their meeting with Welton at the Hardee's restaurant, their payments to Welton to get into the house, the first-time homeowner tax credit issue, and Mr. White being pressured into signing the

documents. Mr. White told Det. Anderson that he did not remember signing any of the documents, and Mrs. White told Det. Anderson that she did not understand the terms of the contract because she had only a third grade education (Filing No. 100-7 at 4–5).

Mrs. White explained to Det. Anderson that after they moved into the house, they began doing repair work on the house, and Welton had promised to return to the house to complete repairs; however, he never came to fix the house. She told Det. Anderson that Thompson showed up at the house one day and told her that he was the actual owner of the house and provided documentation to prove ownership. She explained that while Thompson was at the house Welton also showed up at the house and an argument ensued. To Det. Anderson, "Mrs. White stated she asked Mr. Welton if he owned the house and he stated no, and it was her own fault if she or her husband got scammed." (Filing No. 100-7 at 5.) Ms. White reported to Det. Anderson that Welton and other men came to the house to try to force them out of the house and told the Whites that they had to be out within forty-eight hours. Mrs. White stated that Welton continued to harass them for weeks, so they decided to leave the house in June 2010. Mrs. White explained to Det. Anderson that she believed she was buying the house from Welton and she had lost $1,375.00 in down payments and additional money for repair work as a result of her interactions with Welton. *Id.* at 5–6.

Det. Anderson executed a probable cause affidavit and charging Information on July 14, 2010, against Welton based on the witness statements and the documents that had been collected and her discussions with Thompson, attorney Davis, and the Whites. Based on this evidence, she affirmed under penalties of perjury that she believed there was proof that Welton used a land contract with the intent to defraud to purportedly sell the house while knowing that he did not own the house or have authority to sell the house, thereby committing the crimes of forgery and theft

(Filing No. 100-7 at 6).  Also on July 14, 2010, Det. Anderson signed a sworn Information, stating one count of fraud and two counts of theft (Filing No. 100-6).

Based on the verified statements by Det. Anderson, on July 14, 2010, a criminal case was initiated against Welton in the Marion Superior Court case number 49G04-1007-FC-055142. Welton was arrested on July 19, 2010 (Filing No. 107-13).  He was jailed and, after posting bond, was released on July 20, 2010 (Filing No. 107-31 at 7 ¶25).  On September 2, 2011, the deputy prosecuting attorney voluntarily dismissed the criminal charges against Welton (Filing No. 107-14).

Welton filed this malicious prosecution case against Det. Anderson under 42 U.S.C. § 1983 and against Thompson under Indiana state law on September 3, 2013.  On September 24, 2014, Det. Anderson requested a stay of this matter on the basis that an identical legal claim against Det. Anderson brought by Welton based on separate facts from another criminal case was on appeal to the Seventh Circuit from a decision entered by Judge Jane Magnus-Stinson, *see Welton v. Anderson*, 2013 U.S. Dist. LEXIS 134511 (S.D. Ind. Sept. 19, 2013) [2] (Filing No. 47). The Court granted the request for a stay on September 25, 2014 (Filing No. 48).  On October 28, 2014, the Seventh Circuit affirmed Judge Stinson's decision to dismiss Welton's § 1983 and Indiana state law claims for malicious prosecution.  *See Welton v. Anderson*, 770 F.3d 670 (7th Cir. 2014). Following additional appellate proceedings, the stay in this case was lifted on July 23, 2015 (Filing No. 58).  Welton amended his Complaint on November 4, 2015 (Filing No. 72), and then Det. Anderson filed her Motion for Summary Judgment on May 9, 2016.

---

[2] On May 30, 2007 a probable cause affidavit was signed by Det. Anderson which alleged forgery by Welton involving the National Bank of Indianapolis (*See* Marion Superior Court, Case No. 49G04-0705-FC-097329).  Welton was found not guilty on March 3, 2011. Thereafter, Welton filed an action for Malicious Prosecution against Det. Anderson in federal court on March 4, 2013.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).  "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.   <u>DISCUSSION</u>

In his Statement of Claims, Welton asserts that his malicious prosecution claim against Det. Anderson is brought under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment and also the Fourth Amendment.   Regarding the Fourth Amendment malicious prosecution claim, Welton acknowledges that "[i]n light of the Seventh Circuit opinions, Plaintiff cannot invite this Court to re-examine, or depart from, the binding precedent.  However, Plaintiff wishes to preserve this issue for appeal."  (Filing No. 88 at 1 n.2.)  As the Seventh Circuit discussed in Welton's prior case against Det. Anderson,

> In effect, Welton asks the court to expand actionable Fourth Amendment claims beyond the point of arraignment under the concept of "continuing seizure," which he acknowledges could only be accomplished by departing from our existing precedent. . . .  In light of our precedent, Welton's Fourth Amendment claim cannot stand.  Welton's "seizure" ended when the prosecution began, thus a Fourth Amendment claim based on conduct after that point is necessarily foreclosed.

*Welton*, 770 F.3d at 675.  Based on this circuit's case law and Welton's concession, the Court dismisses Welton's Fourth Amendment claim.

> Malicious prosecution is not by itself an infringement on the constitutional right to due process under the Fourteenth Amendment.  It must also be based on a separate deprivation of a constitutional right.  Welton states no additional constitutional deprivation supporting his malicious prosecution claim.  He only alleges that Officer Anderson prosecuted him without probable cause, but there is no such thing as a constitutional right not to be prosecuted without probable cause.

*Id.* at 674 (citations and quotation marks omitted).

In this current litigation against Det. Anderson, Welton alleges that Det. Anderson had no probable cause to initiate criminal proceedings against him and additionally, he alleges that she knowingly and intentionally submitted false sworn statements and withheld exculpatory evidence.

"To state a malicious prosecution claim under § 1983, a plaintiff must demonstrate that (1) he has satisfied the elements of a state law cause of action for malicious prosecution; (2) the

malicious prosecution was committed by state actors; and (3) he was deprived of liberty." *Id.* (citing *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996)). The elements of an Indiana malicious prosecution claim are: "(1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." *Id.* (quoting *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009) (quoting *Crosson v. Berry*, 829 N.E.2d 184, 189 (Ind. Ct. App. 2005))).

At the summary judgment stage, after Det. Anderson shows entitlement to judgment as a matter of law, Welton must present evidence regarding each of the elements of his claim that creates a genuine issue of material fact that requires trial. Det. Anderson argues that she is entitled to summary judgment on three bases: (1) the evidence established probable cause, (2) there is no evidence that she acted with malice, and (3) Welton suffered no deprivation of liberty. The Court will examine each argument in turn.

## A.   <u>The evidence established probable cause.</u>

Det. Anderson asserts that Welton was arrested pursuant to a facially valid warrant, so malicious prosecution liability can exist only if a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant, citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986). To meet this standard, a plaintiff must point to evidence showing that the officer knowingly and intentionally, or with a reckless disregard for the truth, made false statements to the judicial officer and that the false statements were necessary to the finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Reckless disregard for the truth is shown by establishing that "the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the

information reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003).

The concept of probable cause involves "only a probability or substantial chance of criminal activity, not a certainty that a crime was committed," and that "[i]n determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, we look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight." *Id.* The Seventh Circuit has explained that "[t]he complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Id.*

Det. Anderson asserts that her investigation led her to believe that Welton did not have authority to enter into transactions regarding the house with the Whites and that he had deprived Thompson of the use of the house and the Whites of the use of their money. She explains that Welton claimed to be acting under the authority of Wong Ventures, a company represented by attorney Davis, and Grover Davis explained to Det. Anderson that he would have told Welton not to attempt to sell the house when he did not own it. This led Det. Anderson to believe Welton was acting without the authority of Wong Ventures. Because a reasonable officer could, based on this evidence, believe Welton had acted in an attempt to defraud the Whites or Thompson, Det. Anderson had probable cause to support her Affidavit and Information. Her investigation also led her to believe that Thompson never conveyed the house to Welton, so any efforts by Welton to deny Thompson access to his house were further unlawful activities, thereby providing additional probable cause for the Affidavit and Information.

Throughout his briefing, Welton contends that it was Thompson and/or the Whites who made false statements to police officers, which were the bases for Det. Anderson's probable cause affidavit. (Filing No. 107).  However, Welton has not identified any evidence in the record showing that Det. Anderson knowingly or intentionally, or with a reckless disregard for the truth, made any false statements to the judicial officer and that the false statements were necessary to the judicial officer's determination that probable cause existed for Welton's arrest. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).  A reasonable officer could view the evidence before Det. Anderson and believe Welton had attempt to defraud the Whites, or Thompson, or both, therefore Det. Anderson had established probable cause.

Even if probable cause did not exist, Det. Anderson argues that she would be entitled to qualified immunity because she did not knowingly violate the law, and "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In response to Det. Anderson's arguments, Welton asserts that Det. Anderson's Probable Cause Affidavit was based on the "Land Contract," not the "Lease with Option to Purchase," and the Land Contract never took effect because the contingencies—Wong Ventures securing the deed to the house and the Whites securing a first-time homeowner tax credit from the IRS—were never met. Thus, the Affidavit could not establish probable cause because it was based on a contract that never took effect.  He argues that he and Wong Ventures never took funds from the Whites, and additionally, Welton rescinded the contract after learning of Mr. White's incapacitation and refunded the Whites' payments.

Welton's arguments undermine themselves.  He asserts that he (and Wong Ventures) never took funds from the Whites, yet he contends that he "refunded" their payments.  He asserts that the Land Contract was executory and never took effect, yet he rescinded the contract after receiving a demand letter from the Whites' attorney.  During her investigation, Det. Anderson learned from Mrs. White that she had paid money to Welton to get into the house. This supported Det. Anderson's belief that Welton took money from the Whites.

Much of Welton's argument attacking the probable cause supporting Det. Anderson's Affidavit focuses on the "executory" nature of the Land Contract and that the contract never took effect.  Yet, there were no contingencies in the Land Contract, which noted that "[Wong Ventures] has good and merchantable title to the Real Estate, free and clear of any and all liens, leases, restrictions and encumbrances."  (Filing No. 107-8 at 3 ¶4.)  The Land Contract did not refer to or incorporate the "Lease with Option to Purchase," where the contingencies were noted.  Thus, Welton's arguments regarding the executory nature of the Land Contract are unavailing.

Welton additionally argues that the forgery charge in the Information "entirely rest[s]" on the statements of attorney Davis when he was interviewed by Det. Anderson.  Welton points to Davis's statement that Welton was authorized to sign documents for Wong Ventures and WGO as their manager.  However, Davis also told Det. Anderson that Thompson owned the house, not Wong Ventures, and after learning that a land contract had been executed, he advised Welton that he should not have executed a land contract on the house without owning it.  Thus, Det. Anderson had information from attorney Davis that supported her belief that probable cause existed for a forgery charge.

Welton further explains that probable cause cannot be established on false statements, and he asserts that Det. Anderson based her Affidavit and Information on false statements.  However,

the examples that Welton and his expert provide do not undermine the fact that Det. Anderson had additional evidence that supported her belief that Welton had committed crimes, and Welton's examples also do not establish that Det. Anderson did not believe, or had a reason to doubt the truthfulness of, the facts that had been presented to her that formed the basis for her Affidavit and Information.

When read in context, the examples on which Welton relies actually support Det. Anderson's position. For example, Welton complains that Det. Anderson's Affidavit painted a picture that Welton "helplessly cornered" Mr. White to force him to sign the land contract. Welton quotes from a section of Mrs. White's interview, "They told me to sign it, or the deal was done," and asserts that she—Mrs. White, not Mr. White—was directed to sign the contract (Filing No. 107 at 13). With the full context, it becomes clear that Mrs. White actually was talking about Mr. White being pushed into signing the contract. She had just talked about Mr. White's mental infirmity and stated, "I was the Power of Attorney, everything was going on too quick. They told me to sign it, or the deal was done. So they kind of forced him real quick to go ahead and sign it." (Filing No. 107-27 at 8.)

For another example, Welton complains that Det. Anderson's Affidavit testified to the fact that Welton wanted Thompson to sign over the house without any payment to Thompson, but Det. Anderson also saw evidence that Welton was ready to pay for the house and had informed Thompson that "his money" was waiting for him at Davis's law office (Filing No. 107 at 12). However, Det. Anderson also had evidence that Thompson never received payment and did not convey the house to Welton, as well as testimony from Mrs. White that Welton had made a similar representation to her about a check being at the attorney's office, but no check could be found (Filing No. 107-27 at 10). Based on the evidence before her at the time of making the Affidavit,

17

Det. Anderson had facts that supported probable cause of criminal activity. Again, Welton's example does not show that Det. Anderson did not believe, or had a reason to doubt the truthfulness of, the facts that had been presented to her that formed the basis for her Affidavit.

Det. Anderson received recorded statements and documents from Deputy Prosecutor Hutchison and Sgt. Phillips and then conducted additional interviews with Thompson, attorney Davis, and the Whites. All of this testimony and evidence supported Det. Anderson's belief that there was probable cause that criminal activity had occurred. Det. Anderson reasonably believed that Welton fraudulently induced the Whites to live in a house that Thompson owned and that Welton accepted money for the transaction. She reasonably believed that it did not matter whether Welton accepted the Whites' money on his own behalf or on behalf of Wong Ventures or WGO.

Based on all of the information, Det. Anderson executed a probable cause affidavit and information on July 14, 2010. Welton's designated evidence does not create an issue of material fact that Det. Anderson did not believe, or had a reason to doubt the truthfulness of, the facts that had been presented to her that formed the basis for her Probable Cause Affidavit and Information. Probable cause existed, and Welton's argument concerning a lack of probable cause is unavailing. On this basis alone, summary judgment in favor of Det. Anderson is appropriate.

Further, for these same reason, even if probable cause did not exist, Det. Anderson would be entitled to qualified immunity because she did not knowingly violate the law.

**B.**     **There is no evidence that Det. Anderson acted with malice.**

Det. Anderson asserts that the record is devoid of any evidence that she acted with malice. She explains that, assuming *arguendo*, Welton had entered into an agreement with Thompson, Det. Anderson still did not act maliciously. Malice may be shown "by evidence of personal animosity or inferred from a complete lack of probable cause or a failure to conduct an adequate

investigation under the circumstances." *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009). Det. Anderson testified that she did not, and still does not, believe a house can be conveyed via an oral agreement. She asserts that even if she is mistaken in this belief, a mistake is not malice. Det. Anderson further explains that she did not believe an agreement was ever reached between Welton and Thompson. Even if she was incorrect about her beliefs, they were made in good faith and negate the element of malice.

Responding to this argument, Welton asserts that "actual malice" is not required, but rather, only "legal malice," which can be shown by evidence of false statements. Welton reasserts his arguments regarding a lack of probable cause—attorney Davis's interview statement, the executory nature of the Land Contract, Welton never personally received money from the Whites, and Mrs. White's receipt were her own—to argue that Det. Anderson acted with malice by making false statements. Additionally, through his expert, Welton lists numerous "shortcomings" of Det. Anderson as an investigator and opinions of what a reasonable detective should have observed or done. (Filing No. 107-1). While these shortcomings may show that Det. Anderson is not the best investigator, they are not evidence of malice. As the Court discussed above, there was significant evidence to support Det. Anderson's Probable Cause Affidavit, and Welton failed to present evidence from the record that shows that Det. Anderson did not genuinely believe the statements and evidence provided to her to support her Affidavit. Welton has failed to show a genuine issue of material fact regarding the element of malice to preclude summary judgment.

**C.**   **Welton suffered no deprivation of liberty.**

Det. Anderson asserts that she is entitled to summary judgment for the additional reason that Welton did not suffer a deprivation of liberty, which is a necessary element of his § 1983 malicious prosecution claim. Welton briefly asserts that his claim of malicious prosecution is

cognizable under § 1983, because he suffered post-arraignment loss of liberty when he was arrested on July 19, 2010 and was not released until later on July 20, 2010.  However, this argument fails because the Court has determined that probable cause existed for the arrest.

Det. Anderson further explains that Welton's claim of a *Brady* violation—withholding exculpatory evidence—does not meet the standard to be a *Brady* violation.  "Under *Brady*, the government must disclose favorable evidence that is material to either the defendant's guilt or possible sentence."  *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005).  "In order to prevail under *Brady*, [the plaintiff] must show that:  (1) the government suppressed evidence; (2) the evidence was favorable to the defense, either because it was exculpatory or had impeachment value; and (3) the evidence was material to an issue at trial."  *Id.*  "Evidence is 'material' if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) (citation and quotation marks omitted).

Det. Anderson explains that Welton's criminal case was dismissed on September 2, 2011.  Thus, assuming Welton's assertion that audio recordings of Thompson and Mrs. White's interviews were withheld from his defense counsel is true, those audio recordings would have to be both exculpatory and have changed the outcome of the proceedings to rise to a *Brady* violation.  The dismissal of the criminal case against Welton negates this element of his claim here.

Welton failed to respond to this argument from Det. Anderson.  The Court notes that the result of Welton's criminal proceeding likely would not have been different, assuming that exculpatory evidence was withheld by Det. Anderson, because his criminal case was voluntarily dismissed before going to trial.  Therefore, as Det. Anderson argues, there was no *Brady* violation.  This serves as an additional basis to grant summary judgment to Det. Anderson.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant Shani J. Anderson's Motion for Summary Judgment (Filing No. 98) is **GRANTED**.  Additionally, Defendant Shani J. Anderson's Unopposed Motion to Continue the Final Pretrial and Jury Trial (Filing No. 120) is **DENIED as MOOT**.  Final judgment will issue under separate order.

**SO ORDERED.**

Date: 8/17/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael L. Thompson
1027 South Country Lane
Greenfield, Indiana  46140

Hamid R. Kashani
HKashani@KashaniLaw.com

Benjamin J. Church
OFFICE OF CORPORATION COUNSEL
benjamin.church@indy.gov

Pamela G. Schneeman
OFFICE OF CORPORATION COUNSEL
pamela.schneeman@indy.gov